**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Crim. Action No. 04-128-23 (RMC)** |
| | ) | |
| **LARRY GOOCH,** | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Larry Gooch faces a possible death sentence for the alleged murders of Yolanda

Miller and Calvin Cooper, which are Counts 126 and 128 of the Second Superceding Indictment

("Indictment") filed against him and his various codefendants.  Mr. Gooch, through counsel, has

filed a comprehensive memorandum challenging the constitutionality of the Federal Death Penalty

Act of 1994 ("FDPA"), 18 U.S.C. §§ 3591-3598, both facially and as applied to him.  The Court has

considered these arguments most carefully; while some cause greater pause than others, they are

ultimately without merit, with two exceptions: the Court will order the Government to elaborate on

the nature of its victim impact information, and will limit such information to the family and friends

of the victims of the alleged capital murders.

**I. FACTUAL BACKGROUND**

According to the Government, its evidence will show that Yolanda Miller, age 32,

and Calvin Cooper, age 40, were romantically involved and shared an addiction to phencyclidine

("PCP"), which they used and sold in the area of 18th and M Streets NE in Washington, D.C.  On

Friday, February 21, 2003, at approximately 12:26 a.m., a Metropolitan Police Department officer

was patrolling on foot in the 1200 block of 17th Street NE when shots rang out. The officer ran in the direction of the sounds and saw Mr. Cooper stagger out of an alley off 17th Street. Mr. Cooper collapsed on the sidewalk within sight of the officer and died at the scene.

The officer saw a second man emerge from the alley and flee. This second man was not apprehended, but a handgun, specifically, a Taurus 9 mm semi-automatic pistol, was recovered along the path of his flight. Back in the alley, Mobile Crime Scene officers found four 9 mm shell casings, which ballistics testing later linked to the recovered weapon.

Nine hours later, after daybreak, a citizen reported the discovery of a body at the rear of a home off the same alley. When summoned, officers learned that the occupants of the home had backed their car out of a driveway and discovered a body in the snow drift near where the car had been. Police determined the body to be that of Yolanda Miller. Five 9 mm shell casings found beside her body were matched to the recovered gun, as were two bullets removed from her body.

Additional investigation allegedly revealed that Mr. Cooper and Ms. Miller were members of a drug-trafficking gang known as the M Street Crew.[1] According to the Government, its evidence will show that Ms. Miller was erroneously suspected of cooperating with police and that she and Mr. Cooper were suspected of stealing from other Crew members' drug stashes. Mr. Gooch is alleged to be the shooter, to have acknowledged his role in the crime, and to have said that the

---

[1] Nearly two dozen members of the M Street Crew were charged in the Indictment with narcotics conspiracy, RICO conspiracy, and other crimes of violence, gun possession, and drug possession and distribution in connection with their trafficking activities. These defendants were segregated into three trial groups. The "Group Two" defendants reached a "wired" plea agreement well before trial and have now been sentenced. The "Group One" defendants were tried and convicted in the Spring of 2006 and have now also been sentenced. Mr. Gooch is joined for trial in "Group Three" with the remaining defendants, Kenneth Dodd, Jonte Robinson, and Tommie Dorsey. A separate group of defendants in a related case, *United States v. Bascom*, No. 04-127, was scheduled for trial in Summer 2005 but reached plea agreements just before trial.

2

deaths were intended to "punish them both."  Counts 126 and 128 of the Indictment charge that he

shot Mr. Cooper and Ms. Miller to maintain and increase his position in a racketeering enterprise,

and that the murders constitute violent crimes in aid of racketeering ("VICAR") activity in violation

of 18 U.S.C. § 1959(a)(1).

## II. LEGAL BACKGROUND

Imposition of a death sentence is a matter of grave constitutional concern.  The Eighth

Amendment prohibits cruel and unusual punishment and is violated when a death sentence is

recommended by a jury whose discretion is not "suitably directed and limited so as to minimize the

risk of wholly arbitrary and capricious action."  *Zant v. Stephens*, 462 U.S. 862, 874 (1983) (quoting

*Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (plurality opinion)).  The absence of suitable directions

caused the Supreme Court to strike down Georgia's death penalty statute in *Furman v. Georgia*, 408

U.S. 238 (1972), invalidating by implication similarly unguided regimes throughout the nation.

Reacting to *Furman*, a majority of states enacted new capital punishment schemes.

On July 2, 1976, the Supreme Court issued opinions in five cases addressing these new statutes.  The

Court concluded that those states that had carefully tailored the process of selecting those persons

who might be sentenced to die, while providing the sentencing body with authority to consider the

unique characteristics of each defendant and the circumstances of his offense, had satisfied *Furman*'s

constitutional concerns.  *Gregg v. Georgia*, 428 U.S. 153 (1976); *Proffitt v. Florida*, 428 U.S. 242

(1976); *Jurek v. Texas*, 428 U.S. 262 (1976).  The Court struck down those schemes that prescribed

automatic death sentences for particular classes of convicted murderers without requiring

"particularized consideration of relevant aspects of the character and record of each convicted

defendant before the imposition upon him of a sentence of death."  *Woodson v. North Carolina*, 428

U.S. 280, 303 (1976) (plurality opinion); *see also Roberts v. Louisiana*, 428 U.S. 325 (1976).

Guided by these and later decisions, in 1994 Congress adopted and President Clinton signed the FDPA. In capital prosecutions under the FDPA, as under analogous state regimes, a death penalty trial is typically divided into two major phases: the guilt phase and the penalty phase. Of course, if the defendant is acquitted of the charge for which the Government seeks death, the question of sentencing never reaches the jury. If, however, the jury finds the defendant guilty of the capital crime, it must then move to the penalty phase.

The penalty phase itself has two parts: the jury first decides whether the defendant is eligible for the death penalty, and then it selects the appropriate punishment. During the eligibility phase, the jury must make two preliminary findings: that the Government has proved, beyond a reasonable doubt, that the defendant possessed one of four requisite "intents" at the time of the crime, 18 U.S.C. § 3591(a)(2), and that the Government has proved, beyond a reasonable doubt, that one or more of the aggravating factors enumerated in the statute is present, *id.* § 3592(c)(1)-(16). These two findings must be unanimous. If the jury does not agree unanimously that the Government proved both intent and at least one statutory aggravating factor beyond a reasonable doubt, its work is done; the defendant cannot be sentenced to death, and the Court must impose "a sentence other than death authorized by law." *Id.* § 3593(d). In this case, in the event that Mr. Gooch has been convicted on Counts 126 and 128, such sentence would necessarily be life imprisonment. *See* 18 U.S.C. § 1959(a)(1).

If, however, the jury unanimously agrees that these "gateway" facts — intent and at least one statutory aggravating factor — have been proved beyond a reasonable doubt, the defendant becomes *eligible* for a death sentence, and the jury moves to the selection of either death or

4

incarceration.  In making this decision, the jury considers additional, nonstatutory aggravating factors for which the Government has provided notice, *id.* § 3592(c), and mitigating factors presented by the defendant.[2]  Factors in mitigation need be established by the defendant by only a preponderance of the evidence, not beyond a reasonable doubt, *id.* § 3593(c), and need not be found unanimously; any juror who finds the existence of a mitigating factor may consider that factor in his deliberations, *id.* § 3593(d); *Jones*, 527 U.S. at 377.

Once the jury has completed its fact finding, it "shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death."  18 U.S.C. §3593(e); *Jones*, 527 U.S. at 377.[3]  Unless the jury unanimously recommends death, the court must impose a lesser sentence.  Should the jury recommend death, that judgment is binding upon the court.  18 U.S.C. § 3594.

In this case, pursuant to its obligations under 18 U.S.C. § 3593(a), the Government filed a Notice of Intent to Seek the Death Penalty against Mr. Gooch on October 19, 2005 [Dkt. #378].  The Notice ascribed four potential mental states to Mr. Gooch's alleged crimes, asserting that he: (1) intentionally killed Mr. Cooper and Ms. Miller; (2) intentionally inflicted serious bodily injury that resulted in their deaths; (3) intentionally participated in acts, contemplating that the lives of people would be taken or intending that lethal force would be used, and Mr. Cooper and Ms. Miller died as a direct result; and (4) intentionally and specifically engaged in acts of violence,

---

[2] The FDPA enumerates seven specific mitigating factors, 18 U.S.C. § 3592(a)(1)-(7), and one "catch-all" provision, viz., "[o]ther factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence," *id.* § 3592(a)(8).

[3] If there are no mitigating factors, the jury "shall consider . . . whether the aggravating factor or factors alone are sufficient to justify a sentence of death."  18 U.S.C. §3593(e).

knowing that the acts created grave risks of death, and his actions constituted a reckless disregard

for human life and Mr. Cooper and Ms. Miller died as a direct result.  *See* 18 U.S.C. § 3591(a)(2).

The Notice further identified one statutory aggravating factor: "The defendant

intentionally killed more than one person in a single criminal episode."  18 U.S.C. § 3592(c)(16).

It also listed three nonstatutory aggravating factors: (1) contemporaneous convictions for multiple

murders and other serious acts of violence (which assumes, of course, that Mr. Gooch will be found

guilty of such at trial); (2) future dangerousness, as evidenced by a continuing pattern of violence,

low rehabilitative potential, and membership in a criminal street gang; and (3) the impact of the

murders on the victims and their families.

### III. DISCUSSION

Mr. Gooch raises a host of issues, broadly segregated into facial and as-applied

challenges, which the Court will address seriatim.

### A. Facial Challenges to the FDPA

#### 1. Does the FDPA Adequately Narrow the Class of Persons Eligible for the Death Penalty as Required by the Eighth Amendment?

"[W]here discretion is afforded a sentencing body on a matter so grave as the

determination of whether a human life should be taken or spared, that discretion must be suitably

directed and limited so as to minimize the risk of wholly arbitrary and capricious action."  *Zant*, 462

U.S. at 874 (quoting *Gregg*, 428 U.S. at 189 (plurality opinion).  The jury's discretion may suitably

be curbed in two ways: "The legislature may itself narrow the definition of capital offenses . . . so

that the jury finding of guilt responds to this concern, or the legislature may more broadly define

capital offenses and provide for narrowing by jury findings of aggravating circumstances at the

penalty phase." *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988); *see also Gregg*, 428 U.S. at 196 (plurality opinion).  The FDPA, like most state capital punishment schemes, takes the latter tack, specifying a limited number of aggravating circumstances that make the death penalty appropriate. Such statutory aggravating circumstances must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant*, 462 U.S. at 877.

Mr. Gooch argues that, on its face, the FDPA fails to narrow the broad category of defendants convicted of intentional murder to a smaller class of murderers subject to capital punishment.  He suggests that the mental state finding required by § 3591(a)(2) "does not narrow the class of persons eligible for the death sentence" and is merely "a congressional attempt to comply with the Supreme Court's decision[s] by adding an 'intent' element."  Gooch Mem. at 22.  He also asserts that the list of statutory aggravating factors in § 3592 "is so broad as to apply to essentially any of the vast range of federal offenses where death is provided by statute."  *Id.*  Accordingly, he submits, the FDPA "is unconstitutional on its face requiring the striking of the Notice of Intent to Seek the Death Penalty."  *Id.*

The Court cannot agree.  As to intent, the Supreme Court has instructed that the death penalty may be imposed only on those who possess a sufficiently culpable mental state.  *Edmund v. Florida*, 458 U.S. 782, 797 (1982) (holding that the Eighth Amendment bars imposition of the death penalty upon a felony-murder defendant absent a finding that he personally killed, attempted to kill, or intended that a killing take place or that lethal force would be employed); *Tison v. Arizona*, 481 U.S. 137, 158 (1986) (qualifying *Edmund* and holding that major participation in the felony offense, combined with reckless indifference to human life, is sufficient).  It is unsurprising, then, that in the

7

FDPA Congress provided for a gateway intent factor that limits the universe of defendants otherwise eligible for the death penalty. The requisite intent must meet one of four degrees of culpability: (1) intentional killing; (2) intentional infliction of serious bodily injury leading to death; (3) intentional acts contemplating that life would be taken or intending that lethal force would be used, leading to death; or (4) intentional acts of violence, with knowledge of a grave risk of death and with reckless disregard for human life, leading to death. By so limiting the range of mental states that qualifies a murder defendant for capital punishment, the intent factor at once satisfies the mandates of *Edmund* and *Tison* and narrows the field of death penalty candidates, ensuring that only those who act with direct intention to take a life or who use violence with reckless disregard of its consequences are eligible for a capital sentence. *See United States v. Flores*, 63 F.3d 1342, 1371-72 (5th Cir. 1995); *United States v. Cooper*, 91 F. Supp. 2d 90, 96-97 (D.D.C. 2000); *United States v. Kaczynski*, No. 96-259, 1997 WL 716487, at *17 (E.D. Cal. Nov. 7, 1997); *United States v. Nguyen*, 328 F. Supp. 1525, 1539 (D. Kan. 1996).

As to the statutory aggravating factors, Mr. Gooch's characterization of the FDPA as encompassing essentially all federal capital crimes, no matter the circumstances, is unreasonable. His argument appears to be that each individual aggravating factor is so broad that, taken together, the factors reach all federal capital crimes. He homes in on factors (c)(1), (c)(8), and (c)(16) as unusually broad, without addressing the others. Factor (c)(1) covers homicide that occurs during the commission of twenty other enumerated federal crimes, including the destruction of various transportation equipment and facilities, destruction of property using explosives, hostage taking, terrorism, and treason. Factor (c)(8) covers homicide committed for pecuniary gain. Factor (c)(16) covers multiple homicides in a single criminal episode. Although Mr. Gooch suggests that these

factors "apply to a huge spectrum of killings," Gooch Mem. at 22, this proposition is hardly self-evident, and he offers no empirical data supporting it. *Cf. United States v. Mikos*, No. 02-137, 2003 WL 22110948, at *20 (N.D. Ill. Sept. 11, 2003) (discussing statistical evidence).   The Court is satisfied that, as a whole, the FDPA's statutory aggravating factors perform their required function; that is, they apply "not . . . to every defendant convicted of a murder" but "only to a subclass of defendants convicted of murder," *Tuilaepa v. California*, 512 U.S. 967, 972 (1994), and thereby provide a principled way to distinguish those deserving of death from those who are not.   They elevate an offense of murder above the single fact of death to a truly "aggravated" level.   Mr. Gooch's facial challenge therefore fails.[4]   The weight of authority is in accord with this conclusion.[5]

### 2.   Does the FDPA Meet the Requirements of the Sixth Amendment?

In federal sentencing, the Sixth Amendment requires that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).   How such a fact is labeled — for example, as an "element" of the crime or a "sentencing factor" — is immaterial; when "an increase in a defendant's authorized punishment [is] contingent on the finding of a fact, that fact . . . must be found by the jury beyond a reasonable doubt." *Ring v. Arizona*, 536

---

[4] Were this an as-applied challenge to the single factor attributed to Mr. Gooch, multiple killings in a single criminal episode, § 3592(c)(16), the same conclusion would hold.

[5] *E.g.*, *United States v. Allen*, 247 F.3d 741, 761 (8th Cir. 2001), *vacated on other grounds*, 536 U.S. 953 (2002) ("[T]he FDPA adequately narrows the class of persons eligible for the death penalty and sufficiently channels a jury's sentencing discretion."); *United States v. Le*, 327 F. Supp. 2d 601, 609 (E.D. Va. 2004) ("These FDPA aggravating factors provide objective criteria that cannot reasonably be interpreted to apply to all federal capital crimes."); *Mikos*, 2003 WL 22110948, at *21 ("This court holds that the FDPA has successfully narrowed the class of persons eligible for the imposition of the death penalty."); *Cooper*, 91 F. Supp. 2d 90, 96-97.

U.S. 584, 602 (2002).  This rule applies with equal force to the factfinding necessary for imposition

of the death penalty, including the determination whether an aggravating factor exists.  *Id.* at 609.

To recommend a sentence of death under the FDPA, the jury must: (1) determine that

the defendant acted with the requisite intent; (2) determine that at least one statutory aggravating

factor exists; and, in view of all the relevant information received in aggravation or mitigation,

(3) "consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the

mitigating factor or factors found to exist to justify a sentence of death."  18 U.S.C. § 3593(e).  Each

of these decisions must be unanimous; the first two must, by the FDPA's own terms, be found

beyond a reasonable doubt.  *Id.* §§ 3591(a)(2), 3593(c).  Mr. Gooch argues that, under *Apprendi* and

its progeny, the third consideration amounts to a predicate "fact" necessary to expose a defendant

to death, and must therefore be proved by the Government beyond a reasonable doubt.

Although this argument has yet to find traction in the federal courts, Mr. Gooch

argues that it finds support in four state court decisions.  *Whitfield v. State*, 107 S.W.2d 253, 259

(Mo. 2003); *Woldt v. People*, 64 P.3d 256, 265 (Colo. 2003); *Johnson v. State*, 59 P.3d 450, 460

(Nev. 2002); *State v. Ring*, 65 P.3d 915, 943 (Ariz. 2003).  The Missouri Supreme Court's decision

in *Whitfield* is illustrative.  In that case, the Missouri court rejected the state's contention that a

similar "weighing" step "merely calls for the jury to offer its subjective and discretionary opinion

rather than to make a factual finding."  *Id.* at 259.  The scheme at issue consisted of a four-step

process that required the jury to find: first, the existence of a statutory aggravating factor; second,

that all evidence in aggravation was sufficient to warrant death; third, that any evidence of mitigation

was insufficient to outweigh the evidence in aggravation; and fourth, that "under all of the

circumstances" a sentence of death was appropriate.  *See id.* at 258 (quoting Mo. Rev. Stat.

§ 565.030.4 (1994)).

In *Whitfield*, although the state agreed that the first step constituted a factual finding, it argued that steps two and three called for the exercise of discretion. The court disagreed, finding that the determinations were factual ones, in part because the statute "required . . . a case-by-case factual determination based on all the aggravating facts the trier of fact finds are present in the case." *Id.* at 259. As construed by the court, the scheme's first three steps instruct the jury "to find whether there are mitigating and aggravating circumstances and to weigh them to decide whether the defendant is eligible for the death penalty." *Id.* at 261 (emphasis added). It is "not until th[e] fourth step that the trier of fact is given discretion . . . to give a life sentence even if . . . the aggravators and mitigators would qualify defendant for imposition of the death penalty." *Id.* By analogy, Mr. Gooch argues that the third and final step under the FDPA, under which the jury weighs the aggravating circumstances against the mitigating ones, is likewise a factual finding requiring application of the reasonable doubt standard.

The Court disagrees. The final weighing step under the FDPA does not "increase[] the penalty for a crime beyond the prescribed statutory maximum." *Apprendi*, 530 U.S. at 490. Unlike the Missouri scheme, in which the weighing steps are predicates to a defendant's eligibility for the death sentence, under the FDPA the weighing takes place *after* the jury has confirmed the defendant's death eligibility by finding the requisite intent and the presence of one or more statutory aggravating factors. *See Jones*, 527 U.S. at 377 ("Once petitioner became death-eligible, the jury had to decide whether he should receive a death sentence."). It is at that point that a capital defendant's statutory maximum sentence is established. Subsequent findings as to nonstatutory aggravating factors — which, in any event, are made by a jury beyond a reasonable doubt — do not

11

increase the range of possible punishment; indeed, under the FDPA, the existence of a single

statutory aggravating factor is a sufficient basis for a death sentence.  *See* 18 U.S.C. § 3593(e)

(instructing the jury to consider, "in the absence of a mitigating factor, whether the aggravating factor

. . . alone [is] sufficient to justify a sentence of death"); *United States v. Purkey*, 428 F.3d 738, 749

(8th Cir. 2005) ("Non-statutory aggravating factors do not increase the maximum punishment to

which a defendant is subject.").

   Moreover, the weighing envisioned by the FDPA is less a factual determination than

an exercise of judgment.  The statute provides that, at this final step, the jury

> shall consider whether all the aggravating . . . factors found to exist
> sufficiently outweigh all the mitigating . . . factors found to exist to
> justify a sentence of death . . . .  Based upon this consideration, the
> jury by unanimous vote . . . shall recommend whether the defendant
> should be sentenced to death, to life imprisonment without possibility
> of release or some other lesser sentence.

18 U.S.C. § 3593(e).  This framework does not introduce another factfinding step into the calculus;

it simply "channel[s] the jury's discretion by enunciating specific standards to guide the jury's

consideration of aggravating and mitigating circumstances," *Zant*, 462 U.S. at 875, thus ensuring that

the jury's recommendation is not the outcome of arbitrary thinking.  Such directions, at this final

stage, are not constitutionally required.  In fact,

> [o]nce the jury finds that the defendant falls within the legislatively
> defined category of persons eligible for the death penalty, [it] then is
> free to consider a myriad of factors to determine whether death is the
> appropriate punishment.   Indeed, the sentencer may be given
> unbridled discretion in determining whether the death penalty should
> be  imposed after it has found that the defendant is a member of the
> class made eligible for that penalty.

*Tuilaepa*, 512 U.S. at 979 (citations and internal quotation marks omitted).  That the FDPA guides,

in this limited way, the ultimate weighing of aggravating and mitigating factors does not transform the jury's exercise of judgment into a finding of fact.

Should the jury reach the point of weighing aggravating and mitigating factors, it will have already found the gateway factors to exist and, thus, established the statutory maximum sentence. A wide range of relevant information will then be available to it, including any "other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence." 18 U.S.C. § 3592(a)(8); *see also Gregg*, 428 U.S. at 204 (plurality opinion) ("We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision."). The life or death decision having been committed to the jury, the prescribed weighing is simply the mechanism by which it exercises its discretion to select an appropriate sentence within that range. *See Purkey*, 428 F.3d at 750 ("[I]t makes no sense to speak of the weighing process . . . as an elemental fact . . . . [I]t is . . . the lens through which the jury must focus the facts that it has found . . . ."). In this sense, the jury's role is much like that of a sentencing judge in a noncapital case. There, the sentencing range is bounded on the upper end, and sometimes the lower end, by statute, and the judge exercises her discretion within those confines, guided by all relevant factors, with an eye toward selecting a sentence that is "sufficient, but not greater than necessary" to achieve the goals of federal sentencing. 18 U.S.C. § 3553(a). This is not a determination of fact but a judgment made in light of facts.

Accordingly, the Court concludes that the jury's weighing of aggravating and mitigating circumstances pursuant to 18 U.S.C. § 3593(e) does not constitute a factual finding that elevates the penalty beyond the statutory maximum sentence and, thus, is not subject to the reasonable doubt standard. *See Apprendi*, 530 U.S. at 490.

13

### 3.  Do the Relaxed Evidentiary Standards at the Penalty Hearing Render Any Findings Unreliable and, Therefore, Unconstitutional?

The penalty hearing is, for all intents and purposes, a separate trial at which both sides may call witnesses and present "information" concerning "any matter relevant to the sentence." 18 U.S.C. § 3593(c).  Information may be presented "regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."  *Id.*[6]  Mr. Gooch assails this looser evidentiary standard as failing to ensure the

---

[6] That section provides, in full:

> Notwithstanding rule 32 of the Federal Rules of Criminal Procedure, when a defendant is found guilty or pleads guilty to an offense under section 3591, no presentence report shall be prepared. At the sentencing hearing, information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592. Information presented may include the trial transcript and exhibits if the hearing is held before a jury or judge not present during the trial, or at the trial judge's discretion. The defendant may present any information relevant to a mitigating factor. The government may present any information relevant to an aggravating factor for which notice has been provided under subsection (a). Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury. For the purposes of the preceding sentence, the fact that a victim, as defined in section 3510, attended or observed the trial shall not be construed to pose a danger of creating unfair prejudice, confusing the issues, or misleading the jury. The government and the defendant shall be permitted to rebut any information received at the hearing, and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any aggravating or mitigating factor, and as to the appropriateness in the case of imposing a sentence of death. The government shall open the argument. The defendant shall be permitted to reply. The government

"heightened 'need for reliability'" required in capital cases. *See Caldwell v. Mississippi*, 472 U.S. 320, 323 (1985) (quoting *Woodson*, 428 U.S. at 305 (plurality opinion)). He describes "an evidentiary free-for-all" that "would allow a jury to sentence a defendant to death without permitting him to confront the witnesses against him and without even the presence of circumstantial guarantees of accuracy embodied in the hearsay rules." Gooch Mem. at 27.

While the FDPA dispenses with the Federal Rules of Evidence during the penalty phase, it will hardly yield the tumult that Mr. Gooch fears. Not just any information is permitted; admissible information must, at a minimum, concern a "matter *relevant* to the sentence." 18 U.S.C. § 3593(c) (emphasis added).[7] Indeed, the FDPA's analog to the traditional Rule 403 balancing test in fact strengthens the Court's gatekeeping role, as it permits the exclusion of information whose probative value is merely "outweighed" — not "substantially outweighed" — by prejudicial concerns. *Compare* 18 U.S.C. § 3593(c) *with* Fed. R. Evid. 403; *United States v. Jones*, 132 F.3d 232, 241 n.7 (5th Cir. 1998), *aff'd*, 527 U.S. 373 (1999); *United States v. Regan*, 221 F. Supp. 2d 672, 682 (E.D. Va. 2002). Thus, there is no merit to the contention that the FDPA impinges on a

---

> shall then be permitted to reply in rebuttal. The burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond a reasonable doubt. The burden of establishing the existence of any mitigating factor is on the defendant, and is not satisfied unless the existence of such a factor is established by a preponderance of the information.

18 U.S.C. § 3593(c).

[7] "The 'meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding' from its meaning during the case in chief; evidence is relevant if 'it tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.'" *United States v. Webster*, 162 F.3d 308, 356 n.74 (5th Cir. 1998) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990)).

defendant's Confrontation Clause or other constitutional rights.  The FDPA "expressly supplants only the rules of evidence, not constitutional standards." *United States v. Johnson*, 239 F. Supp. 2d 924, 946 (N.D. Iowa 2003).  "[I]t remains for the court, in the exercise of its judgment and discretion, to ensure that unconstitutional evidence otherwise admissible under applicable evidentiary rules is excluded from trial.  The FDPA does not eliminate this function of the judge as gatekeeper of constitutionally permissible evidence; nor does it alter or eliminate the constitutional baseline for the admissibility of evidence in a criminal trial." *United States v. Fell*, 360 F.3d 135, 145 (2d Cir. 2004).

This Court agrees that the evidentiary standard prescribed by the FDPA for the penalty phase of a capital trial is consistent with constitutional requirements.  It places before the jury "all possible relevant information about the individual defendant whose fate it must determine," *California v. Ramos*, 463 U.S. 992, 1006 (1983) (quoting *Jurek*, 428 U.S. at 276 (plurality opinion)), and "helps to accomplish the individualized sentencing" the Constitution requires, *Jones*, 132 F.3d at 242.

### 4.  Does the FDPA Fail to Provide for Meaningful Appellate Review?

The FDPA's appellate review provisions provide that, upon a condemned defendant's filing of a timely notice of appeal, the Court of Appeals "shall review the entire record in the case" and "address all substantive and procedural issues raised on the appeal."  18 U.S.C. § 3595.  The Court of Appeals is directed to remand the case for reconsideration when:

> (A) the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
>
> (B) the admissible evidence and information adduced does not support the special finding of the existence of the required

16

aggravating factor; or

(C) the proceedings involved any other legal error requiring reversal of the sentence that was properly preserved for appeal under the rules of criminal procedure.

18 U.S.C. § 3595(c)(2).

Mr. Gooch argues that because the FDPA does not provide for mandatory, automatic appellate review, it neglects to "'ensur[e] that the death penalty is not imposed arbitrarily or irrationally.'" Gooch Mem. at 29-30 (quoting *Parker v. Dugger*, 498 U.S. 308, 321 (1990)). Specifically, he objects to the FDPA's provision for appellate review "if — and only if — a capital defendant exercises his right and files a timely notice of appeal." *Id.* at 30. Requiring a condemned defendant to file a notice of appeal within ten days of the entry of judgment, at a time when he may be depressed or suicidal, he contends, risks extinguishing prematurely any right to a meaningful appeal and is "incompatible with 'evolving stand[ards] of decency that mark the progress of a maturing society.'" *Id.* at 31 (quoting *Trop v. Dulles*, 356 U.S. 86, 100 (1958)).

The Supreme Court has "emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally." *Parker*, 498 U.S. at 321 (citing *Clemons v. Mississippi*, 494 U.S. 738, 749 (1990)). Although the Court has never definitively specified the components of such review, it has explained that, in the Eighth Amendment context, "the primary concern . . . [is] that the sentencing decision be based on the facts and circumstances of the defendant, his background, and his crime." *Clemons*, 494 U.S. at 748. As such, "[i]n scrutinizing death penalty procedures . . . the Court has emphasized the 'twin objectives' of 'measured consistent application and fairness to the accused,'" *id.* (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 110-11 (1982)), and the importance of "promot[ing] reliability and consistency" in

17

capital sentencing, *Clemons*, 494 U.S. at 749.  The FDPA directs the Court of Appeals to review the entire record, with particular attention to whether the requisite statutory aggravating factor was adequately proved; whether passion, prejudice, or other arbitrariness infected the sentence; and whether other nonharmless legal error warrants reversal.  18 U.S.C. § 3595(c)(2).  Mr. Gooch's chief complaint is that this review is available only to defendants who seek it.

Although most states provide for the automatic appeal of death sentences, *Pulley*, 465 U.S. at 44, and the Supreme Court has certainly looked with favor on such procedural protections, *Gregg*, 428 U.S. at 198 (characterizing an automatic appeal as an "important additional safeguard"), it has never held that automatic appeals are constitutionally required, *Cooper*, 91 F. Supp. 2d at 99. Much to the contrary, criminal defendants are permitted to waive constitutional safeguards in a number of weighty contexts; so long as a waiver is knowing and voluntary, it is accorded respect. *See Iowa v. Tovar*, 541 U.S. 77, 81 (2004); *Jones v. Barnes*, 463 U.S. 745, 751 (1983).  While, to be sure, "death is different," *Gregg*, 428 U.S. at 188 (plurality opinion), the rationale Mr. Gooch offers for requiring automatic appeals — that a defendant might abandon his appellate rights during a temporary bout of depression or suicidal ideation — is nothing more than unsupported speculation about hypothetical situations, and is no basis to invalidate the statute.  These fears can be assuaged in an individual case, should they materialize, by careful scrutiny of a defendant's competence to waive his appellate rights.  *See United States v. McVeigh*, 944 F. Supp. 1478, 1484 (D. Colo. 1996).[8]

_____

[8] Some courts have held that a condemned defendant is unable to waive appellate or collateral review of a death sentence, even knowingly and voluntarily, because it is not just the defendant, but society as a whole, that has an interest in ensuring that the death penalty is not imposed arbitrarily. *See, e.g.*, *Comer v. Schriro*, 463 F.3d 934, 949-951 (9th Cir. 2006) (stating that a defendant who waives habeas review "is coopting the power of the state's capital punishment system to kill . . . . The people's interest in justice, which forms the basis of the state's power to execute, should not be so easily commandeered."); *State v. Martini*, 677 A.2d 1106, 605 (N.J. 1996) ("The public has an

Moreover, a capital defendant is afforded at least two counsel, 18 U.S.C. § 3005, who are obligated to advise a defendant on his appellate rights when "there is reason to think . . . that a rational defendant would want to appeal." *Roe v. Flores-Ortega*, 528 U.S. 470, 480 (2000). And filing a notice of appeal is a simple, ministerial task, easily undertaken by counsel on a defendant's behalf. Accordingly, the Court finds the appellate review provisions of the FDPA constitutionally sufficient, notwithstanding that appeal is not automatic.

Mr. Gooch next argues that the FDPA impermissibly limits the scope of appellate review by interfering with the operation of the plain error doctrine. Specifically, he interprets 18 U.S.C. § 3595(c)(2)(C), which mandates remand when "the proceedings involved any other legal error requiring reversal of the sentence that was properly preserved for appeal under the rules of criminal procedure," to mean that unpreserved error, even when plain, will go unremedied unless it warrants remand under § 3595(c)(2)(A) or § 3595(c)(2)(B). Gooch Mem. at 31-32.

This argument is foreclosed by the Supreme Court's opinion in *Jones* — its first, in fact, to review a death sentence imposed under the FDPA. In *Jones*, the defendant assigned error to a penalty phase jury instruction to which he did not object at trial. The Court explained that, although Federal Rule of Criminal Procedure 30, which requires the parties to raise any objections to jury instructions before the jury retires to deliberate, "could be read literally to bar any review of petitioner's claims of error, our decisions have held that an appellate court may conduct a limited

---

interest in the reliability and integrity of a death sentencing decision that transcends the preferences of individual defendants."); *see also Whitmore v. Arkansas*, 495 U.S. 149, 172 (1990) (Marshall, J., dissenting) ("Because a wrongful execution is an affront to society as a whole, a person may not consent to being executed without appellate review."). This particular argument — that society's interest in avoiding the arbitrary imposition of capital punishment should prevent a defendant from competently foregoing appellate review — has not been raised by Mr. Gooch.

19

review for plain error." *Jones*, 527 U.S. at 388.[9]  Thus, the failure to object at trial did not bar plain

error review, despite the text of Rule 30.  Unsatisfied, the defendant pressed on, arguing that the jury

instruction should be reviewed for arbitrariness under § 3595(c)(2)(A), which, he contended, was

exempt from plain error review.  The Supreme Court rejected this reading as "untenable," stating that

"[t]he statute does not explicitly announce an exception to plain-error review, and a congressional

intent to create such an exception cannot be inferred from the overall scheme."  *Jones*, 527 U.S. at

388-89.  Noting that § 3595(c)(2)(C) requires errors to be "properly preserved," the Court read this

"timely objection requirement" to apply to § 3595(c)(2) as a whole, and reviewed the jury instruction

for plain error.  *Id.* at 389.  Thus, although the text of § 3595(c)(2)(C) might seem, at first blush, to

bar even plain error review of unpreserved error, *Jones* clarifies that unpreserved error falling within

any subsection of § 3595(c)(2) is subject to plain error review.

Moreover, similar language in the Anti-Drug Abuse Act ("ADAA"), 21 U.S.C.

§ 848(q)(3), has been found sufficiently broad to "provide for conventional appellate review,

including review of all errors of law."  *United States v. Pretlow*, 779 F. Supp. 758, 764 (D.N.J.

1991); *see also United States v. Walker*, 910 F. Supp. 837, 845 (N.D.N.Y. 1995) (concluding that

"the phrase 'any other arbitrary factor' is broad enough to encompass the essential elements of

meaningful appellate review"); *United States v. Chandler*, 996 F.2d 1073, 1097 (11th Cir. 1993)

(according plain error review to unpreserved error).  Mr. Gooch's challenge to the FDPA on the basis

of limited appellate rights is without merit.[10]

---

[9] Rule 30 was amended in 2002 to incorporate the Court's opinion in *Jones*.

[10] In view of this disposition, the Court need not reach Mr. Gooch's argument that the FDPA runs afoul of the Fifth Amendment's Equal Protection Clause by singling out condemned prisoners for appellate review of limited scope.  Gooch Mem. at 33.

**5. Is it Constitutional to Use Nonstatutory Aggravating Factors in a Capital Sentencing Phase?**

Mr. Gooch further argues that in allowing the Government discretion to select nonstatutory aggravating factors, the FDPA: (1) injects impermissible arbitrariness into the capital sentencing phase; (2) violates the legislative nondelegation doctrine; and (3) violates the Ex Post Facto Clause. Each argument fails upon consideration.

**a. Arbitrariness**

In the first wave of his attack, Mr. Gooch argues that "construing § 3592(c) as authorizing the [G]overnment to unilaterally expand the statutory list of aggravating factors on a case-by-case basis would inject into capital proceedings precisely the uncertainty and disparate case results that *Furman* [*v. Georgia*, 408 U.S. 238 (1972),] found to violate the Eighth Amendment." Gooch Mem. at 34. The Court disagrees. As the Supreme Court has recognized, in death penalty proceedings there is some tension between the need, at the eligibility stage, to cabin the jury's discretion so that the risk of arbitrary decisionmaking is minimized and death sentences are made rationally reviewable, and the importance, at the selection stage, of placing before the jury all possible relevant information bearing on the character of the defendant and the circumstances of the offense so that an individualized sentence results. *See, e.g.*, *Tuilaepa*, 512 U.S. at 973. But once the jury has determined that intent and a statutory aggravating factor are present, so that a particular defendant is eligible for a death sentence, the Constitution does not require it to ignore "other possible aggravating factors" that suggest death is the appropriate punishment at the selection stage. *Zant*, 462 U.S. at 878-79; *see also Tuilaepa*, 512 U.S. at 979. At the point of selecting between life and death, "[w]hat is important . . . is an *individualized* determination on the basis of the character

21

of the individual and the circumstances of the crime." *Zant*, 462 U.S. at 879. Far from inviting caprice, the presentation of nonstatutory aggravating factors, much like the presentation of mitigating factors, focuses the jury's discretion and fosters an individualized decision.

Moreover, Mr. Gooch's suggestion that the Government's discretion in crafting nonstatutory aggravating factors is "restricted only by the imagination of the prosecution" is pure hyperbole. The Government must notify the capital defendant of any such factors it intends to prove. 18 U.S.C. 3593(a). Nonstatutory aggravating factors are invalid if unconstitutionally vague, *see Tuilaepa*, 512 U.S. at 972, or overbroad, *see Jones*, 119 S. Ct. at 2108. And the information presented to establish such factors must be relevant and may be excluded if its probative value is outweighed by prejudicial concerns. 18 U.S.C. § 3593(c). Thus, the use of nonstatutory aggravating factors does not render the FDPA's sentencing phase unconstitutionally arbitrary. *See Cooper*, 91 F. Supp. 2d at 100.

### b. Delegation of Legislative Power

Mr. Gooch's next thrust charges that "Congress'[s] delegation to the Government of the power to define aggravating factors represents an impermissible delegation of legislative power in violation of the separation of powers principle and the nondelegation doctrine." Gooch Mem. at 35 (capitals omitted). He equates the prosecution's presentation of information establishing nonstatutory aggravating factors with "[d]efining what constitutes criminal conduct and setting appropriate sanctions," which, he argues, are "quintessential legislative decision[s]." Gooch Mem. at 36. Not so. This argument mistakes the role of nonstatutory aggravating factors, which serve neither to proscribe conduct nor to fix sanctions; indeed, they have nothing to do with the crimes

charged or whether a defendant will be found eligible for death. In prosecutions under the FDPA,

the capital crimes are selected and defined by Congress, as are the gateway factors governing the

death eligibility of any defendant. The prosecution's discretion is "wholly circumscribed by the

statute's requirement that the jury unanimously find at least one intent factor and one statutory

aggravating factor before the defendant becomes death eligible. Only after the selection of these

critical, legislatively-defined factors is made is the prosecution afforded discretion to argue that

additional nonstatutory aggravating factors" make death the appropriate sentence. *United States v.*

*Higgs*, 353 F.3d 281, 321 (4th Cir. 2003). Accordingly, the FDPA does not delegate a legislative

function to the prosecution. Even if it did, however, "any delegation involved [is] sufficiently

circumscribed by 'intelligible principles' to avoid violating separation of powers principles." *United*

*States v. Tipton*, 90 F.3d 861, 895 (4th Cir. 1996).

### c. Ex Post Facto

In a final parry, Mr. Gooch asserts that the FDPA "violates the ban on ex post facto

laws by permitting the Department of Justice to define nonstatutory aggravating circumstances after

the crimes but before trial." Gooch Mem. at 37 (capitals omitted). He continues, "Assuming[,]

*arguendo*, that [Mr. Gooch] has done these things, there was no way for [him] to have known that

these acts would one day be used to potentially tip the balance against him at a capital sentencing

proceeding.  The conduct referenced [in the Notice] was rendered criminally significant solely by

the action of the United States Attorney, years after it had been committed." Gooch Mem. at 38.

Again, this argument confuses the effect of nonstatutory aggravating factors.[11]

---

[11] Mr. Gooch summarily asserts that he "will have to defend against evidence of which he had inadequate notice and inadequate time to investigate" if the Court permits the use of the

Article I, § 9 of the Constitution provides that "[n]o ex post facto Law shall be passed."  In general, the Clause prohibits any statute "which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission[;] or which deprives one charged with crime of any defense available according to law at the time when the act was committed."  *Dobbert v. Florida*, 432 U.S. 282, 292 (1977) (quoting *Beazell v. Ohio*, 269 U.S. 167, 169-170 (1925)).  Briefly put, "the Clause is aimed at laws that retroactively alter the definition of crimes or increase the punishment for criminal acts." *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 504 (1995) (internal quotation marks omitted).  The presentation of nonstatutory aggravating factors at the selection stage does not alter the definition of the underlying capital offense; thus, the question is whether it increases the punishment attached to the underlying offense.  *See id.* at 505.  The answer to the question is "no."  The introduction of nonstatutory aggravating factors in no way alters the penalty by which a crime is *punishable* — in other words, the maximum punishment — which is fixed at death once guilt and the gateway factors have been established.  Nonstatutory aggravating factors and mitigating factors, by contrast, "are weighed by the jury to make the individualized determination to impose the death sentence upon a defendant who has already been found eligible.  They do not increase the possible punishment or alter the elements of the offense."  *Higgs*, 353 F.3d at 322.  Thus, the FDPA raises no ex post facto concerns.[12]

_____

nonstatutory aggravating factors.  Gooch Mem. at 39.  This argument is boilerplate and bears no relation to the facts of this case.  The Government's Notice was filed on October 19, 2005.  Jury selection will begin on January 9, 2007.  There has been more than enough time to prepare.

[12] Mr. Gooch briefly argues that the "catch-all" provision in § 3592(c), which states that the jury may consider "whether any other [i.e., nonstatutory] aggravating factor for which notice has been given exists," contradicts the text of § 3591, which provides that a defendant shall be sentenced

### 6.  Does the Eighth Amendment Require Proportionality Review?

"[P]roportionality review presumes that the death sentence is not disproportionate to the crime in the traditional sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime." *Pulley v. Harris*, 465 U.S. 37, 43 (1984).  Mr. Gooch concedes, as he must, that proportionality review is not constitutionally required in every capital sentencing scheme, but maintains that "its omission is fatal in a statute that permits arbitrary and disproportionate sentencing by authorizing the prosecution to create and rely on nonstatutory aggravating factors in capital sentencing," Gooch Mem. at 40, 42.

The Court is not persuaded by this distinction.  The Supreme Court made clear in *Pulley* that proportionality review, though an "additional safeguard against arbitrarily imposed death sentences," is not constitutionally required. *Pulley*, 465 U.S. at 50.  In view of the FDPA's other safeguards promoting the rational application of the death penalty, this Court joins the many others that have rejected this argument and adopts their reasoning as persuasive. *See Cooper*, 91 F. Supp. 2d at 99 (collecting cases); *Pretlow*, 779 F. Supp. at 768-69.

---

to death, if that punishment is deemed justified, "after consideration of the factors set forth in § 3592." Gooch Mem. at 39-40.  In short, his argument is that nonstatutory aggravating factors, by definition, are not "set forth" in § 3592.  For the reasons cogently set forth by others, the Court rejects this strained attempt to render inoperative the portion of § 3592(c) providing for the use of nonstatutory aggravating factors. *See, e.g.*, *Nguyen*, 928 F. Supp at 1536; *Le*, 327 F. Supp. 2d at 614.

### 7. Does the Death Penalty under all Circumstances Constitute Cruel and Unusual Punishment in Violation of the Eighth Amendment?

Mr. Gooch seeks to preserve the claim that the death penalty is, in all cases, cruel and unusual punishment. Gooch Mem. at 42-44. This argument is foreclosed by Supreme Court precedent, *McCleskey v. Kemp*, 481 U.S. 279, 301-02 (1987); *Gregg*, 428 U.S. at 187; *Higgs*, 353 F.3d at 333, and it is, of course, the "[Supreme] Court's prerogative alone to overrule one of its precedents." *United States v. Hatter*, 532 U.S. 557, 567 (2001).

### 8. Does the FDPA Unconstitutionally Limit a Defendant's Right to Present Mitigation Evidence?

Mr. Gooch argues that he is entitled to have the jury consider *all relevant* mitigating factors, *see Lockett v. Ohio*, 438 U.S. 586, 608 (1978), but that the FDPA limits him to presenting information of a "*significant* impair[ment]," 18 U.S.C. § 3592(a)(1), "*unusual and substantial* duress," *id.* § 3592(a)(2), and "*severe* mental or emotional disturbance," *id.* § 3592(a)(6). Gooch Mem. at 44-45 (emphases added by Mr. Gooch). Section 3592(a)(8) mutes these concerns, however, in that it allows a defendant to present information regarding "other factors in [his] background, record, or character or any other circumstance of the offense that mitigate against imposition of a death sentence." 18 U.S.C. § 3592(a)(8); *see also id.* § 3592(a) ("[T]he finder of fact shall consider *any* mitigating factor, including the [enumerated factors].") (emphasis added). Mr. Gooch insists that, despite the broad, inclusive language of § 3592(a)(8), there is a "clear risk" that jurors "would conclude that unless a mitigating circumstance met the specific qualifications set forth in [§3592(a)(1)-(7)], they would be precluded from considering it under [§3592(a)(8)]." Gooch Mem. at 45. The Court disagrees. Clear jury instructions would eliminate any such risk. *See Zafiro v.*

*United States*, 506 U.S. 534, 540 (1993) ("[J]uries are presumed to follow their instructions.").

Mr. Gooch also challenges 18 U.S.C. § 3593(f), which instructs the Court to advise the jury that it "shall not consider the race, color, religious beliefs, national origin, or sex of the defendant or of any victim" "in considering whether a sentence of death is justified." It further instructs that "the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or of any victim may be." *Id.* Mr. Gooch submits that these provisions bar a capital defendant from introducing mitigating evidence related to his religious beliefs or prior racial discrimination. Gooch Mem. at 45. These concerns are misplaced.

In order to preserve a defendant's right to present all relevant mitigating information to the jury and avoid constitutional concerns, *see Lockett*, 438 U.S. at 608, a number of courts have construed § 3593(f) as precluding consideration of such factors in aggravation, but not in mitigation. *See, e.g.*, *United States v. Davis*, 904 F. Supp. 554, 563 (E.D. La. 1995) ("The statute specifically states that the jury is to reject those personal characteristics only in considering whether death is justified. The jury is not instructed to disregard those factors in favoring life instead of death."); *Nguyen*, 928 F. Supp. at 1547 ("It is clear that the intent of Congress in enacting this section was to preclude the improper consideration of these factors as aggravating, not to preclude their proper consideration as mitigating."). The flaw in this approach is that factors such as the "race, religion, or political affiliation of the defendant" are "constitutionally impermissible or totally irrelevant to the sentencing process." *Zant*, 462 U.S. at 885. Accordingly, the better view is that, "in order to pass constitutional muster, the FDPA must be interpreted to prohibit consideration of protected factors such as race, color, religion, gender, and national origin as either an aggravating or a

27

mitigating factor during sentencing." *Cooper*, 91 F. Supp. 2d at 101. Not precluded, however, is information related to the "effects and experiences" of such factors. As the Fifth Circuit has explained, using race as an example:

> [A]lthough race *per se* is an irrelevant and inadmissible factor, the *effects* and *experiences* of race may be admissible. If a defendant can show that his life has been marked by discrimination or some other set of experiences . . . , then that properly might be admissable [sic] as relevant mitigating background or character evidence. But this is a far cry from using race in and of itself as a proxy for such a set of beliefs and experiences. Pigmentation does not define a person's character or background; the life that a person has led and the things that he has experienced do.

*United States v. Webster*, 162 F.3d 308, 356-57 (5th 1998). Thus, in barring the consideration of the race, color, religious beliefs, national origin, or sex of the defendant, but permitting relevant information about the effects of those factors on the defendant's character, § 3593(f) comports fully with the constitutional concerns at stake.

### 9. Does the FDPA Impermissibly Fail to Provide A Standard for the Jury to Employ in Balancing Aggravating and Mitigating Factors?

Here, Mr. Gooch argues that, at the final step of the selection stage, when the jury "considers whether all the aggravating . . . factors found to exist sufficiently outweigh all the mitigating . . . factors found to exist to justify a sentence of death," 18 U.S.C. § 3593(e), "there is no standard of proof provided by the statute nor any hint as to how these factors should be weighed so that Mr. Gooch can be reasonably assured that the jury's discretion has been properly channeled." Gooch Mem. at 47.

This argument is a re-tread of the earlier argument that this "weighing process" constitutes a factual determination that must be proved beyond a reasonable doubt.  *See supra* Part III.A.2.  It fares no better with new rubber.  The weighing mechanism prescribed by § 3593(e) sufficiently "channel[s] the jury's discretion by enunciating specific standards to guide the jury's consideration of aggravating and mitigating circumstances."  *Zant*, 462 U.S. at 875; *see Tuilaepa*, 512 U.S. at 979.

### 10.  Does the FDPA Impermissibly Deprive the Defendant of the Opportunity to Rebut the Government's Argument at the Penalty Phase of the Trial?

As with the guilt phase of the trial, during the penalty phase the Government has the opportunity to make the first and last closing arguments, with the defendant's closing sandwiched in between.[13]  Mr. Gooch asserts that this allocation of argument violates his rights to due process, effective assistance of counsel, and a reliable sentencing determination under the Fifth, Sixth, and Eight Amendments, respectively.  His one-paragraph argument cites no supporting authority.

The Government bears the burden of establishing the existence of the gateway factors beyond a reasonable doubt, findings absent which a defendant cannot be sentenced to death.  The order of argument prescribed by § 3593(c) mirrors that set forth in Federal Rule of Criminal Procedure 29.1 for guilt-phase proceedings.  This order of argument is entirely consistent with the allocation of the burden of proof.  The defendant's protections come from the requirement that the requisite intent and all aggravating factors be proved beyond a reasonable doubt to the unanimous satisfaction of the jury, while mitigating factors need only be demonstrated by a preponderance of

---

[13] "The [G]overnment shall open the argument.  The defendant shall be permitted to reply. The [G]overnment shall then be permitted to reply in rebuttal."  18 U.S.C. § 3593(c).

the information to any juror who wishes to consider them.  And, of course, at the final step of the

selection phase, the jury must unanimously agree that a death sentence is justified.  These statutory

procedures incline toward life, not death.  Under such circumstances, it is entirely appropriate to

retain the normal rules of procedure.  *See United States v. Minerd*, 176 F. Supp. 2d 424, 437 (W.D.

Pa. 2001); *United States v. Cooper*, 754 F. Supp. 617, 627 n.17 (N.D. Ill. 1990).

### 11.  Does the FDPA Impermissibly Prohibit the Defendant from Waiving a Jury Trial on the Death Penalty Without the Government's Consent?

The FDPA provides that the penalty phase may be conducted "before the court alone,

upon motion of the defendant and with the approval of the attorney for the government"; otherwise,

it is to take place before a jury.  18 U.S.C. § 3593(b).  Mr. Gooch argues that this provision "forces

a jury determination of punishment on the defendant" because it, "in effect, grants the government

a right to trial by jury" by allowing it to "veto . . . a defendant's decision to waive a penalty phase

jury."  Gooch Mem. at 48-49.  He further asserts that "[t]he heightened concern for reliability in the

context of capital sentencing proceedings mandates that a defendant be entitled to determine the

fairest forum to plead his case for life — judge or jury — without interference from the

government."  *Id.* at 49.  Mr. Gooch does otherwise identify the source of this right, nor can he, for

it does not exist.

More than four decades ago, the Supreme Court in *Singer v. United States*, 380 U.S.

24, 25 (1965), considered whether "the Constitution gives a defendant in a federal criminal case the

right to waive a jury trial whenever he believes such action to be in his best interest, regardless of

whether the prosecution and the court are willing to acquiesce in the waiver."  In *Singer*, the

defendant argued that Federal Rule of Criminal Procedure 23, which provides that cases required to

be tried by a jury shall be so tried absent the defendant's waiver and the prosecutor's and court's consent, violated the Fifth, Sixth, Ninth, and Tenth Amendments. *Id.* at 26.  Finding no support for the proposition that criminal defendants had a common law right to insist on a bench trial, and noting that the Constitution, by its own terms, does not confer such a right, the Supreme Court concluded that a "defendant's only constitutional right concerning the method of trial is to an impartial trial by jury." *Id.* at 36.  Reasoning that the "ability to waive a constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right," it found "no constitutional impediment to conditioning a waiver of this right on the consent of the prosecuting attorney and the trial judge when, if either refuses to consent, the result is simply that the defendant is subject to an impartial trial by jury — the very thing that the Constitution guarantees him." *Id.* at 34-36.

Mr. Gooch resists the obvious analogy to *Singer* by seizing upon the Court's comment that it need not determine "whether there might be some circumstances where a defendant's reasons for wanting to be tried by a judge alone are so compelling that the Government's insistence on trial by jury would result in the denial to a defendant of an impartial trial."  Gooch Mem. at 48 (citing *Singer*, 380 U.S. at 37).  Whatever those circumstances, they are not met here.  Mr. Gooch suggests only that the death-qualification process may yield a jury "less than sympathetic to the case for mitigation," *id.* (citing *Witherspoon v. Illinois*, 391 U.S. 510 (1968)), and that there is "overwhelming statistical evidence that[,] in certain scenarios, racial considerations will seep into the jury's decisionmaking process," *id.* (citing *McClesky v. Kemp*, 481 U.S. 279 (1987)).  But, as Mr. Gooch recognizes, the death-qualification process is "wholly constitutional," *id.*, and thus does not deprive a defendant of the right to an impartial jury.  Moreover, to make out an equal protection claim under *McClesky*, a defendant "must prove that the decisionmakers in his case acted with

31

discriminatory purpose" by offering "evidence specific to his own case that would support an inference that racial considerations played a part in his sentence." *McClesky*, 481 U.S. at 292-93. Mr. Gooch offers nothing of the kind, apparently relying only on a statistical study — held insufficient in *McClesky* itself — that purports to demonstrate racial disparities in the imposition of the death penalty in Georgia during the 1970s.[14]

Accordingly, the Court finds that the Constitution "neither confers nor recognizes" a right of criminal defendants to insist on a penalty phase hearing before the Court, and that § 3593(b) sets forth a "reasonable procedure" governing attempted waivers of the right conferred by the FDPA to a capital sentencing hearing before a jury. *See Singer*, 380 U.S. at 26; *see also Cooper*, 91 F. Supp. 2d at 103 (rejecting identical arguments).

### 12.   Does the FDPA's Appellate Remand Provision Violate the Double Jeopardy Clause of the Fifth Amendment?

The FDPA provides that the Court of Appeals "shall remand the case for reconsideration under § 3593 or imposition of a sentence other than death" whenever it finds that any of three circumstances is present:

> (A) the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
>
> (B) the admissible evidence and information adduced does not support the special finding of the existence of the required aggravating factor; or

---

[14] Further, although this is a facial challenge, the Court notes that Mr. Gooch has not moved — or even hinted at a desire — to have his penalty hearing conducted before the Court alone, rather than before a jury.

> (C) the proceedings involved any other legal error requiring reversal
> of the sentence that was properly preserved for appeal under the rules
> of criminal procedure.

18 U.S.C. § 3595(c)(2).  Mr. Gooch argues that remand for "reconsideration under § 3593" under the second of these circumstances — that is, when the Court of Appeals has concluded that there is insufficient evidence of the statutory aggravating factor — violates the Double Jeopardy Clause. Gooch Mem. at 49-50.  Although the Government appears to agree that remand for a second round of death penalty sentencing hearings under such circumstances would be a double jeopardy violation, *see* Gov't Opp'n at 62, it urges the court to adopt a construction that would avoid any constitutional infirmity, *id.* at 63 (citing *Rust v. Sullivan*, 500 U.S. 173, 190 (1991)).

The Court agrees that this is the proper course.  The statute is phrased in the disjunctive, providing for remand for reconsideration *or* a sentence other than death.  Read the most logical way, and in conjunction with constitutional protections, if the Court of Appeals finds insufficient evidence of the statutory aggravating factor, any remand would be for imposition of a sentence other than death.  *See Cooper*, 91 F. Supp. at 99-100; *Davis*, 904 F. Supp. at 563-64.

## B.  Challenges to the FDPA Specific to Mr. Gooch

### 1.  Does the Indictment Violate the Fifth Amendment's Indictment Clause?

As part of the Indictment, the grand jury returned three special findings as to Counts 126 and 128 against Mr. Gooch: (1) that he was over the age of eighteen at the time of the offenses; (2) that he committed the offenses with the requisite level of intent under 18 U.S.C. § 3591(a); and (3) that he intentionally killed more than one person in a single criminal episode as set forth in 18 U.S.C. § 3592(c)(16).  In the first of his as-applied challenges to the FDPA, Mr. Gooch argues that

33

the Indictment runs afoul of the Fifth Amendment's Indictment Clause because the grand jury was

not informed that the imposition of the death penalty was a potential consequence of these special

findings.

The Indictment Clause provides that "[n]o person shall be held to answer for a capital,

or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const.

amend. V. Historically, Mr. Gooch explains, the grand jury was fully aware of the consequences of

its charging decision in capital cases, because in the early years of the Republic the states uniformly

"followed the common-law practice of making death the exclusive and mandatory sentence for

certain specified offenses," including "all homicides that were not involuntary, provoked, justified,

or excused." *Woodson v. North Carolina*, 428 U.S. 280, 289 (1976).[15]   The Supreme Court has

acknowledged, in dicta, this role:

> The grand jury, like the petit jury, acts as a vital check against the
> wrongful exercise of power by the State and its prosecutors. It
> controls not only the initial decision to indict, but also significant
> decisions such as how many counts to charge and whether to charge
> a greater or lesser offense, including the important decision to charge
> a capital crime.

*Campbell v. Louisiana*, 523 U.S. 392, 399 (1998) (internal quotation marks and citation omitted);

*see also Vazquez v. Hillery*, 474 U.S. 254, 263 (1986) ("In the hands of the grand jury lies the power

to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most

---

[15]   The federal government apparently followed suit. Rory K. Little, The Federal Death
Penalty: History And Some Thoughts About The Department Of Justice's Role, 26 Fordham Urb.
L.J. 347, 362-63 (1999) ("[T]he First Congress . . . enacted a lengthy 'Act for the Punishment of
Certain Crimes Against the United States[,' 1 Stat. 112-19 (1790)].  Federal offenses of treason,
murder, piracy and forgery were defined and . . . the mandatory penalty upon conviction was set at
death." (footnotes omitted)).

significant of all, a capital offense or a noncapital offense — all on the basis of the same facts.").

In modern times, however, not all murders are capital offenses and sentences are highly individualized; thus, the correlation between offense and punishment is not a direct one, and the grand jury may not always be cognizant of the sentencing consequences of its charging decisions. In fact, part of the model charge recommended by the Judicial Conference of the United States instructs the grand jurors that, "when deciding whether or not to indict, you should not be concerned about punishment in the event of conviction." Model Grand Jury Charge ¶ 10 (Judicial Conference of the United States Mar. 2005). Mr. Gooch contends that this deviation from the historic understanding of the grand jury's role in sorting capital from noncapital charges violates the Indictment Clause. As he explains, "[i]f the grand jury is not informed of the capital nature of the offense, it cannot express the conscience of the community[16] or perform its constitutionally assigned role as a 'barrier . . . between the liberties of the people and the prerogative of the [government].'" Gooch Mem. at 58 (quoting *Harris v. United States*, 536 U.S. 545, 564 (2002)) (omission in original).[17]

---

[16] Mr. Gooch elaborates that the relevant community is a local one and that the FDPA implicates federalism concerns. Gooch Mem. at 59. In that vein, he suggests that only "state legislature[s] be allowed the freedom to determine the morality and utility of the death penalty" and reminds the Court that D.C. voters have consistently rejected the death penalty by referendum and in recent capital trials. *Id.* Similarly, he attacks, as part of his facial challenge, the Attorney General's power to determine whether to seek the death penalty as a violation of the Indictment Clause. *Id.* at 50-52. Although this argument is a bit disjointed, the thrust seems to be that because the decision whether to seek the death penalty is made by the Attorney General at the national level, and the petit jury in a capital case is death-qualified but the grand jury is not, the grand jury is the only local entity that reliably reflects community standards and, therefore, it is constitutionally imperative that the grand jury affirmatively recognize that it is charging a capital crime.

[17] Mr. Gooch credits K. Brent Tomer's article, Ring Around the Grand Jury: Informing Grand Jurors of the Capital Consequences of Aggravating Facts, 17 Cap. Def. J. 61 (2004), for inspiring this argument.

The Government first responds that an indictment need only charge the elements necessary to constitute the offense, not the punishment sought.  But this is no answer.  Mr. Gooch's present argument does not allege a defect in the Indictment itself, such as lack of specificity resulting in inadequate notice, *see, e.g.*, *United States v. Hamling*, 418 U.S. 87, 117 (1974), but a structural error, *cf. United States v. Navarro-Vargas*, 408 F.3d 1184, 1188 (2005) (en banc) (considering whether allegedly improper model grand jury instructions constitute structural error).  The issue is whether the grand jury's historic role in deciding whether to charge a capital crime, recognized in *Campbell*, 523 U.S. at 399, is merely an artifact from a bygone era in which it was plain that certain convictions yielded death sentences, or a constitutionally essential function of the grand jury.

The Court need not reach this difficult question, however, because it rests on two suppositions presented without factual foundation: (1) grand juries in general do not know that the capital crimes they charge in a federal indictment could result in a death penalty; and (2) in this case, the grand jury indicting Mr. Gooch on Counts 126 and 128 did not know that he might face the death penalty as a result of their special findings.  As concerns Mr. Gooch, the Government states that "the defense argument assumes that the grand jury was never informed that they were considering a case involving potential capital litigation.  They cite no facts in support of their assumption, not could they, because their assumption is in error."  Gov't Opp'n at 79.  Since as a matter of fact the grand jury knew that the nature of the charges in the Indictment could well lead to a death sentence, the Court will not address the significance, if any, of the return of a capital indictment without the jury's so understanding.

**2. Does the Indictment Violate the Fifth and Sixth Amendments for Failing to Allege an Essential Element?**

Mr. Gooch next alleges that the Indictment violates the Fifth and Sixth Amendments for failing to allege "the third element necessary for the grand jury to make the decision as to whether Mr. Gooch should be subject to the death penalty, *i.e.*, whether the aggravating factors outweigh the mitigating factors." Gooch Mem. at 57, 62. This is essentially a replay of the earlier argument that the petit jury makes a finding of fact when it weighs aggravating and mitigating factors to reach its final judgment. *See supra* Part III.A.2. The Court has already addressed this fallacy at length and need not repeat itself. As made in connection with the argument that the Indictment is fatally flawed, it fails again.

**3.  Has the United States Engaged in Unconstitutional Forum Shopping?**

Mr. Gooch claims that the murders of Mr. Cooper and Ms. Miller are mere D.C. Code violations that should be prosecuted in the D.C. Superior Court,[18] that federal jurisdiction is based "solely upon allegations of drug trafficking which, at best, serve only as a background to the alleged murders," and, therefore, that the Government is "engaging in blatant forum shopping" in violation of the Fifth and Eighth Amendments by prosecuting these murders as VICAR offenses. Gooch Mem. at 63. He cites no authority for this proposition.

The Government alleges that Mr. Cooper and Ms. Miller were murdered because they were suspected of stealing drug stashes from other M Street Crew members or cooperating with law enforcement. Such conduct would, inevitably, interfere with the operation of the alleged RICO

_____

[18] In the District of Columbia, the U.S. Attorney is the prosecuting authority in both local and federal court, and determines where charges will be brought.

enterprise if it is found to have existed.  Since a different jury has found, beyond a reasonable doubt, that the M Street Crew engaged in both drug and RICO conspiracies, *see supra* n.1, the Court is not faced with terrible uncertainty about the legitimacy of those allegations.  What is, of course, totally unknown and unpredictable is whether a second jury would so find and whether the evidence exists to connect Mr. Gooch and the Cooper/Miller murders to the RICO enterprise.  But the Court cannot agree that the Government engaged in improper forum shopping by adding Counts 126 and 128 to the Indictment.  On their face, these charges relate to the allegations of a RICO enterprise, and are properly charged under federal law.

### 4. Was the Notice of Intent to Seek the Death Penalty Sufficiently Specific to Meet the Requirements of 18 U.S.C. § 3593(a) and the Constitution?

The FDPA requires the Government to notify a capital defendant of its "belie[f] that the circumstances of the offense are such that . . . a sentence of death is justified" and "the aggravating factor or factors that [it] . . . proposes to prove as justifying a sentence of death." 18 U.S.C. § 3553(a).  Mr. Gooch argues that the Government's Notice was infirm and must be dismissed because it did not plead the mental state or one of the nonstatutory aggravating factors with sufficient specificity to permit him to prepare his defense.

### a.  Mental States

The Notice ascribed four potential mental states to Mr. Gooch's alleged crimes; to summarize: (1) intentional killing; (2) intentional infliction of serious bodily injury; (3) intentional participation in acts contemplating lives would be taken; and (4) intentional acts of violence with reckless disregard for human life. Mr. Gooch attacks the Notice as flawed "because a person cannot simultaneously possess four different mental states."  Gooch Mem. at 68.  More critically, Mr.

Gooch argues that "the jury should not be allowed to find all of these mental states, because to do so impermissibly skews the process towards death." *Id.* at 69.  He also assails the lack of factual specificity in the Notice, asking the Court to require the Government to specify which of the four categories applies to the deaths and to outline the factual basis for each contention.  *Id.* at 71.

Mr. Gooch relies heavily on *United States v. Tipton*, 90 F.3d 861, 899 (4th Cir. 1996), in which the Fourth Circuit found error in the district court's permitting a jury to find more than one mental state. The *Tipton* court concluded that "[t]o allow cumulative findings of these intended alternative circumstances, all of which do involve different forms of criminal intent, runs a clear risk of skewing the weighing process in favor of the death penalty and thereby causing it to be imposed arbitrarily, hence unconstitutionally." *Id.*  *Tipton*, however, reviewed a capital sentence imposed under the ADAA, under which the intent elements are aggravating factors that are weighed against mitigating factors in the jury's final decision whether to recommend death. Under the FDPA, by contrast, the mental states are not aggravating factors in the weighing process; the jury must find one of the mental states as a gateway factor, along with at least one statutory aggravating factor, before it reaches the selection stage and considers the question of life or death. As a result, the Fourth Circuit understandably has found no error in submitting multiple intent factors to a jury under the FDPA because they are not used in the weighing process. *United States v. Jackson*, 327 F.3d 273, 300-01 (4th Cir. 2003); *see also Cooper*, 91 F. Supp. 2d at 110 (finding "no risk of skewing because the jury finds intent, and then starts with a clean slate in evaluating separate aggravating factors"). Against this background, Mr. Gooch maintains that no death-qualified jury, having convicted a defendant and then found four mental states, "is capable of the mental gymnastics necessary to start with a clean slate, especially since the other aggravating and mitigating factors are weighed in the

same proceeding." Gooch Mem. at 70 (internal quotation marks omitted).

These arguments fail for a number of reasons.  First, the FDPA does not require that the Government identify any mental state in the Notice. *See* 18 U.S.C. § 3593(a) (requiring only aggravating factor(s) to be identified).  Therefore, the fact that the Government currently believes its evidence might show more than one level of intent is certainly not injurious of any of Mr. Gooch's rights.  Second, with multiple murders at issue, it is certainly conceivable that the evidence could show multiple mental states.  *See Flores*, 63 F.3d at 1370-1373 (affirming finding as to existence of multiple mental culpability factors).  Third, in the event of a guilty verdict, the jury will consider whether the Government has proved intent and the statutory aggravating factor at a different time than it weighs all the aggravating and mitigating factors to select the penalty.  As stated during the motions hearing on October 25, 2006, the Court anticipates a trifurcated proceeding, meaning that the penalty phase will be divided in two: the jury will first consider the gateway factors and, only if they are proved, will proceed to consider and weigh information concerning all aggravating and mitigating factors.[19]  Fourth, the Government contends that Mr. Gooch actually acted upon all four types of intent when he allegedly killed Mr. Cooper and Ms. Miller.  Gov't Opp'n at 86.  This is a matter of proof that must await trial.

Relying solely on *United States v. Glover*, 43 F. Supp. 2d 1217 (D. Kan. 1999), Mr. Gooch also asks the Court to require the Government to outline the factual basis underlying each

---

[19] The Court plans to allow counsel to argue whether the gateway factors have been proved but does not anticipate lengthy evidence on the point inasmuch as the parties will presumably rely on the evidence adduced during the guilt phase.  If the jury finds that the gateway factors have been proved, after a suitable break the jury would reconvene to hear additional information concerning aggravating and mitigating factors.

alleged mental state.  The *Glover* court was "of the view that the defendant is entitled to know the underlying factual basis for each of the gateway factors." *Id.* at 1233.  But the court did not explain its reasoning, which reduces its ability to persuade.  Other authority is to the contrary.  *See United States v. Battle*, 173 F.3d 1343, 1347 (11th Cir. 1999) ("The Government is not required to provide specific evidence in its notice of intent."); *Nguyen*, 928 F. Supp. at 1545-46 (finding notice adequate when it listed only aggravating circumstances and provided no evidentiary detail).

This Court respectfully disagrees with *Glover*.  Mr. Gooch has already received full discovery from the Government, as contemplated and required by Rule 16 of the Federal Rules of Criminal Procedure; that discovery yielded well over 100 compact discs' worth of information.  Mr. Gooch is not really asking for the underlying *factual* basis for each gateway factor — he already has all the facts — but, instead, for *how* the Government plans to use the evidence it has amassed. The Government has no obligation to give him a preview of its evidentiary presentation.

### b. Victim Impact

The Government's Notice informed Mr. Gooch that he had allegedly caused the deaths of Calvin Cooper, Yolanda Miller, Christopher Lane, William Cunningham, and Miguel Miles, all of whom enjoyed a strong relationship with their families and whose families therefore suffered severe and irreparable harm.  The Government states that it intends to present information on the loss, injury, and harm to all five victims and their families as part of its case concerning nonstatutory aggravating factors. However, it is only Counts 126 and 128 — the alleged VICAR murders of Mr. Cooper and Ms. Miller — that are the capital offenses and are alleged to fulfill the requirements of a statutory aggravating factor.  Mr. Gooch asserts that the FDPA expressly limits

victim impact evidence to capital charges and that victim impact evidence as to Messrs. Lane, Cunningham, and Miles may not be introduced to the jury in the selection phase.  He also challenges the description of the victim impact evidence as too broad, conclusory, and vague to meet constitutional standards.

### i. Scope of Victim Impact

The FDPA provides that victim impact information may constitute a nonstatutory aggravating factor, and may include "oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information."  18 U.S.C. § 3593(a).  Mr. Gooch argues that the statute refers only to the victims of capital charges, and that a contrary reading would permit highly prejudicial information to infect the sentencing decision.  Gooch Mem. at 73-80.  The Government contends that Mr. Gooch reads the FDPA too narrowly.  Gov't Opp'n at 92-93.

Clearly, the FDPA refers to the victims of a capital crime.  Whether Mr. Gooch committed additional, noncapital murders will be determined in the guilt phase by the jury and may be noted as a nonstatutory aggravating factor if the trial advances to the selection phase.  That does not mean, however, that the families of his other alleged victims can properly testify at the selection phase.  Mr. Gooch's sentence for any noncapital crimes of which he is found guilty will be determined by the Court.  The families of any other murder victims will have the opportunity to address the Court for that sentencing.[20]  Their losses and emotions are not relevant to whether the

---

[20] The Government also suggests that the victims of noncapital crimes may have an independent right under the Crime Victims' Rights Act of 2004 ("CVRA"), 18 U.S.C. § 3771, to be heard during the penalty phase of a capital trial.  That statute provides crime victims the "right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing,

jury selects the death penalty for the alleged murders of Mr. Cooper and Ms. Miller and would also

be more prejudicial than probative.  *See* 18 U.S.C. § 3593(c).

### ii.  Sufficiency of Notice of Victim Impact

The Government's Notice describes the expected victim impact evidence as follows:

> As reflected by the victims' personal characteristics as human beings and the impact of the offense[s] on the victims and the victims' families, the defendant caused loss, injury, and harm to the victims and the victims' families, see Payne v. Tennessee, 501 U.S. 808, 825-827 (1991), including, but not limited to, the following:
>
> (a) Characteristics of the victims
>
> (i) [through (v)] The defendant caused the death of Yolanda Miller, [Calvin Cooper, Christopher Lane, William Cunningham, III, and Miguel Miles], . . . who enjoyed a strong relationship with [their] famil[ies].
>
> (b) Impact of the offense on the families of the victims
>
> The victims' families have suffered severe and irreparable harm.

Notice at 3-4.  Mr. Gooch argues that this generic language is inadequate to guide his penalty phase

preparation or to assist the court in limiting the scope of victim impact information to that which is

truly aggravating.

There is no question that "victim vulnerability and victim impact evidence are

appropriate subjects for the capital sentencer's  consideration," so long as the "factors are used to

direct the jury to the individual circumstances of the case" and the "process [remains] neutral and

---

or any parole proceeding."  *Id.*  § 3771(a)(4).  However, that right is afforded only during a "proceeding involving an offense against a crime victim."  *Id.* § 3771(b)(1).  The capital sentencing proceeding here "involves" only Counts 126 and 128; allowing the victims of noncapital crimes to speak at a separate sentencing hearing will properly preserve those victims' CVRA rights.

principled so as to guard against bias or caprice in the sentencing decision." *Jones*, 527 U.S. at 402. In *Jones*, the Supreme Court upheld against vagueness and overbreadth challenges a similarly imprecise notice that specified only that the "[victim's] personal characteristics and the effect of the instant offense on [the victim's] family constitute an aggravating factor of the offense." *Id.* at 378 n.3. It stopped short, however, of endorsing this lack of specificity, commenting that "[t]he error in this case, if any, rests in loose drafting of the nonstatutory aggravating factors." *Id.* at 402.

Mr. Gooch contends that subsequent authority in the lower courts suggests that greater detail is advisable to give the defendant proper notice and to assist the Court in executing its duties as an evidentiary gatekeeper. To this end, he cites *Glover*, 43 F. Supp. 2d at 1224 (finding that "serious physical and emotional injury" was insufficient); *United States v. Bin Laden*, 126 F. Supp. 2d 290, 304 (S.D.N.Y. 2001) (finding that "[a]n oblique reference to victims' 'injury, harm, and loss,' without more, does nothing to guide Defendants' vital task of preparing for the penalty phase of trial"); and *Cooper*, 91 F. Supp. 2d at 111 (requiring the government to provide "more specific information concerning the extent and scope of the injuries and loss suffered by each victim, his or her family members, and other relevant individuals, and as to each victim's 'personal characteristics' that the government intends to prove"). Gooch Mem. at 81-82.

The Government halfheartedly attempts to distinguish these cases, suggesting that "there [will be] no similarly lengthy duration of the 'liability phase' of the case," as in *Bin Laden*; and that *Cooper* "involved a forty-eight count indictment, allegations of racketeering and three murders." Gov't Opp'n at 91. Since the instant matter is scheduled for a four-month guilt-phase trial and the Indictment contains 159 counts, including narcotics and RICO conspiracies and five murders, these distinctions are more nice than obvious. The Government also suggests that it "has

44

a vested interest in trying this case without leading the court to commit reversible error" and that Mr.

Gooch is "very unlikely to challenge the victim impact testimony such that intense preparation for

that portion of the case would be necessary." *Id.* at 92.

These arguments miss the mark.  Whether it will take "intense preparation" for the

penalty phase or not, that preparation must be done.  There will be no extended hiatus between the

guilt phase and the penalty phase of this trial, and counsel must enter the guilt phase prepared to

proceed in short order to the penalty phase should Mr. Gooch be convicted on Counts 126 and 128.

The reality is, of course, that both sides are already scrambling to be ready for trial in January.  The

Government prefers to rest on the normal modes of discovery given to a criminal defendant: "a

witness list, *Jencks*[21] materials, and a copy of the penalty phase exhibits before any witness

testifies."  Gov't Opp'n at 92.  However, the mantra that "death is different" really applies here.

Presenting information about victim impact to a jury that has convicted a defendant of a capital crime

is different than presenting such information to a judge months after a trial is completed and at a time

when the parties (and jury) are no longer exhausted from trial and no longer have frayed nerves from

deliberations.

As a practical matter, therefore, the Court agrees with Mr. Gooch that the Government

should address further the nature of the information it will provide as victim impact information.

Accordingly, in the exercise of its inherent authority, the Court will order the Government to outline

the type and scope of the "loss, injury, and harm" suffered by each victim, his or her family

members, and other individuals as relevant, and the "personal characteristics" of each victim that it

---

[21] *Jencks v. United States*, 353 U.S. 657 (1957).

intends to prove.  Notice at 3-4; *see Cooper*, 91 F. Supp. 2d at 111.  "The Court envisions a document that is akin to an informative outline, but not a revelation of evidentiary detail or the Government's theory of its case."  *Bin Laden*, 126 F. Supp. 2d 290, 304.  This can be accomplished with a written pleading or in open court before trial begins, as counsel for the Government prefer. As a legal matter, however, the Court finds that the Notice was sufficient for its purpose and need not be dismissed.  *See Jones*, 527 U.S. at 402.

### 5.  Must the Statutory Aggravating Factor Be Dismissed as Overbroad, Vague, and Duplicative?

The alleged statutory aggravating factor set forth in the Indictment and Notice is that Mr. Gooch "intentionally killed more than one person in a single criminal episode."  Notice at 3; 18 U.S.C. § 3592(c)(16).  To perform its constitutional function, this factor "must meet two requirements.  First, [it] may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder.  Second, [it] may not be unconstitutionally vague." *Tuilaepa*, 512 U.S. at 972.  Mr. Gooch argues that this factor is overbroad, vague, and duplicative of the intent gateway factor and the nonstatutory aggravating factors.

"An aggravating factor can be overbroad if the sentencing jury 'fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty.'" *Jones*, 527 U.S. at 401 (quoting *Arave v. Creech*, 507 U.S. 463, 474 (1993)).  That is not a reasonable description of this factor for the simple reason that a defendant need not kill more than one person to be eligible for the death penalty; for example, the murder of a single person for pecuniary gain, with substantial premeditation, or in a manner that involves torture can subject a defendant to the death penalty.  *See* 18 U.S.C. § 3592(c)(6), (7), (9).  Moreover, not all defendants who kill more than

one person fall within this factor's scope; the homicides must occur during "a single criminal episode." *Id.* § 3592(c)(16). Mr. Gooch's argument that this is a "de facto aggravator" because, as he explains, if he is found guilty of the Cooper/Miller murders the jury "will automatically have to conclude that the [G]overnment has [proven] the statutory aggravating factor of multiple killings," Gooch Mem. at 88, is both incorrect and unavailing. Even assuming a conviction on both counts, the Government will have to satisfy the jury, beyond a reasonable doubt, that the murders took place during the same criminal episode. In any event, the term "de facto aggravator," while a nice turn of phrase, is misleading. The proper comparison for narrowing purposes is not against the crimes for which Mr. Gooch may be convicted, or even all multiple homicides,[22] but against all homicides in general. Mr. Gooch's protestations to the contrary are devoid of merit.

The "controlling objective" in vagueness review is "[e]nsuring that a sentence of death is not . . . infected with bias or caprice." *Jones*, 527 U.S. at 400. Review for vagueness is deferential, however, and "[a]s long as an aggravating factor has a core meaning that criminal juries should be capable of understanding, it will pass constitutional muster." *Id.* Although Mr. Gooch suggests a vagueness problem in a heading in his motion, Gooch Mem. at 85, he does not argue the point until his reply brief, which complains that "the reference to an unspecified 'person' is . . . unconstitutionally vague," Gooch Reply at 8. Counsel has also suggested, in open court, that the

---

[22] In particular, Mr. Gooch argues at length that pending across the nation are a number of federal indictments in which three or more people have been murdered but the United States is not seeking the death penalty. This argument misses the point that it is not the raw number of murders with which Mr. Gooch is charged, but the charge of multiple murders in a *single criminal episode*, that causes him to face the death penalty. Further, there is no foundation or authority to question the Attorney General's decision to seek the death penalty in unrelated cases and under circumstances unknown to the Court.

term "episode" is vague.   The Court cannot agree.   Although the Notice does not identify the

"person[s]" killed, Counts 126 and 128 of the Indictment identify the victims as Mr. Cooper and Ms.

Miller, as all parties have long been aware.   Moreover, based on what the Government has divulged

of its anticipated evidence and theory of the case, the jury could find that, although the victims'

bodies were discovered some hours apart, they were killed at about the same time, since it appears

that a single gun was used for both and was recovered immediately after Mr. Cooper's death.   On

these facts, the term "episode" is not vague for purposes of this as-applied challenge.

There is also no duplication.   Although the Supreme Court has "never . . . held that

aggravating factors could be duplicative so as to render them constitutionally invalid," *Jones*, 527

U.S. at 398, at least two circuits have held that duplication can lead to "double counting" that, in a

weighing scheme, has "a tendency to skew the process so as to give rise to the risk of an arbitrary,

and thus unconstitutional, death sentence."   *Id.* (citing *United States v. Jones*, 132 F.3d 232, 251 (5th

Cir. 1998), and *United States v. McCullah*, 76 F.3d 1087, 1111 (10th Cir. 1996)).   Assuming this test

is the proper one, Mr. Gooch's argument still fails.   Although Mr. Gooch correctly points out that

the statutory aggravating factor overlaps with the gateway intent factor, in that both require an

"intentional" act, this coincidence is unimportant; the heart of the statutory aggravating factor is the

fact of a double homicide during a single criminal episode, not intent.   In any event, the intent factor

is a threshold finding that is not weighed during the selection phase, so there is no opportunity for

it to skew the result.   As to the nonstatutory aggravating factors of contemporaneous convictions and

future dangerousness, these consider not only the Cooper/Miller murders but also the murders of

Messrs. Cunningham, Lane, and Miles, in addition to evidence that Mr. Gooch attempted to kill a

police officer as part of his role as "enforcer" in a street gang and drug trafficking organization.   The

48

response to Mr. Gooch's argument that these factors are duplicative "to the extent [they are] based on all the evidence adduced at trial," Gooch Reply at 8, is that here, as in *Jones*, "at best, certain evidence [i]s relevant to two different aggravating factors." *Id.* at 399.

### 6.  Is the Victim Impact Nonstatutory Aggravating Factor Invalid for Failing to Sufficiently Narrow the Class?

Mr. Gooch next argues that the nonstatutory aggravating factor of victim impact, as charged, does not describe any "aggravating" circumstance "other" than the crime itself and is, therefore, invalid.  Gooch Reply at 25.  He suggests that every murder of a family member causes "severe" and "extreme" harm to the family, which means it is not "aggravating" to make these particular crimes any "worse" than other murders.  *Id.*  As a result, he asserts, this factor does nothing to narrow the class of murders for whom the death penalty is available.

This argument, which amounts to an overbreadth challenge to victim impact evidence, confuses the purposes of statutory factors and nonstatutory aggravating factors.  *Cf. Jones*, 527 U.S. at 401 ("We have not . . . specifically considered what it means for a factor to be overbroad when it is important only for selection purposes and especially when it sets forth victim vulnerability or victim impact evidence.").  Only the former are required to narrow the class of murderers who might properly face the death penalty; the latter serve as additional information for the sentencer.  Once the jury has found guilt and the gateway factors, the focus appropriately shifts to providing it with all possible relevant information to enable it to tailor its verdict to the individual defendant.  So long as that information is relevant to the character of the defendant or the circumstances of the crime, consideration of nonstatutory aggravating factors, like consideration of mitigating factors, serves the useful purpose of ensuring an individualized sentencing determination that minimizes the risk of

49

arbitrary and capricious action.  *See Barclay v. Florida*, 463 U.S. 939, 966-967 (1983) (Stevens, J.,

concurring); *see also Tuilaepa*, 512 U.S. at 979.

Even if victim impact evidence were susceptible to challenge for overbreadth, the

Supreme Court has made clear that, while "the *concepts* of victim impact and victim vulnerability

may well be relevant in every case, *evidence* of victim vulnerability and victim impact in a particular

case is inherently individualized." *Jones*, 327 U.S. at 401.  The victim impact information here, as

clarified in accord with Part III.B.4.b.ii, *supra*, will appropriately "direct the jury to the individual

circumstances of the case" and "guard against bias or caprice in the sentencing decision." *Id.* at 402.

Accordingly, this factor is not invalid as overbroad.

### 7.  Must the Nonstatutory Aggravating Factors Be Dismissed?

Finally, Mr. Gooch attacks, for various reasons, each of the nonstatutory aggravating

factors noticed by the Government.  As an initial broadside, however, he insists that the nonstatutory

aggravating factors do not constitutionally limit and guide the discretion of the jury, as required by

*Gregg*, 428 U.S. at 189.  Gooch Mem. at 91.  More precisely, he asserts that "permit[ting] different

prosecutors, in each individual case, to create and select the factors that may be placed on 'death's

scale' injects the very arbitrariness and capriciousness into the sentencing process that *Furman*

sought to eradicate." *Id.* at 92 (citation omitted).  Mr. Gooch repeats himself, but the Court need not,

as it addressed and rejected this argument as part of his facial challenge.  *See supra* Part III.A.5.a.

Another repeated refrain, that the "catch-all" provision in § 3592(c) conflicts with the text of § 3591,

is also rejected for reasons already explained.  *See supra* n.12.

With these broad challenges dispatched, the Court turns to Mr. Gooch's arguments against the nonstatutory aggravating factors individually.

### a. Contemporaneous Convictions

The first nonstatutory aggravating factor, contemporaneous convictions, states that Mr. Gooch "faces contemporaneous convictions for multiple murders and other serious acts of violence, including murders and the attempted murder of a police officer." Notice at 3. Mr. Gooch argues that this factor is duplicative of the statutory aggravating factor, multiple killings in a single criminal episode. Gooch Reply at 15. The overlap here is insignificant. The statutory aggravating factor, unlike the nonstatutory one, requires that multiple killings take place during a "single criminal episode." The nonstatutory aggravating factor also encompasses the murders of Messrs. Cunningham, Lane, and Miles, and the attempted murder of a police officer. These differences are sufficient to eliminate any risk that "double counting" might lead to an arbitrary or irrational sentence. *Jones*, 527 U.S. at 398.

### b. Future Dangerousness

Mr. Gooch focuses his complaints on the charge of future dangerousness. On that score, the Notice alleges:

> The defendant represents a continuing danger to the lives and safety of other persons. The defendant is likely to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others, as evidenced by, at least, one or more of the following:
>
> (a) Continuing Pattern of Violence
>
> The defendant has engaged in a continuing pattern of violence, attempted violence, and threatened violence including, at least, the crimes alleged against the defendant in the Indictment.

(b) <u>Low rehabilitative potential</u>

 The defendant has demonstrated a low potential for rehabilitation as evidenced by his longstanding involvement in criminal activities, including drug trafficking and violence, leading up to the capital offenses charged in the Indictment.

(c) <u>Membership in a criminal street gang</u>

 The defendant has demonstrated an allegiance to and active membership in the M Street Crew, an organization falling within the definition of criminal street gangs set forth in 18 U.S.C. § 521(a).[23]

Notice at 3-4.  This factor has sparked a host of challenges.  Mr. Gooch argues that considering future dangerousness as a separate aggravating factor runs contrary to congressional intent as manifested in the structure of the FDPA.  He notes that several of the statutory agrravating factors enumerated in § 3592(c) explicitly take into account prior convictions.  *See* 18 U.S.C. § 3592(c)(2) (prior conviction of violent felony involving firearm), (c)(3) (previous conviction of offense for which a sentence of death or life imprisonment was authorized), (c)(4) (previous conviction for other

---

 [23] In general terms, 18 U.S.C. § 521 provides for a sentence enhancement of up to ten years when members of a criminal street gang commit certain federal felony crimes of violence or controlled substance offenses in connection with their gang membership.  *See, e.g.*, *United States v. Matthews*, 312 F.3d 652, 655-56 (5th Cir. 2002) (describing the statutory scheme).  It defines a "criminal street gang" as

> an ongoing group, club, organization, or association of 5 or more persons—
>  (A) that has as 1 of its primary purposes the commission of 1 or more of the [federal felony crimes of violence or controlled substance offenses] described in subsection (c);
>  (B) the members of which engage, or have engaged within the past 5 years, in a continuing series of offenses described in subsection (c); and
>  (C) the activities of which affect interstate or foreign commerce.

18 U.S.C. § 521(a).

serious offense involving serious bodily injury or death), (c)(10) (previous conviction for two felony drug offenses), (c)(12) (previous conviction for a serious federal drug offense), and (c)(15) (prior conviction of sexual assault or child molestation).  In his view, because the enumerated factors evidence a concern with prior criminal conduct, which, he suggests, correlates strongly with future dangerousness, the statute should be read to bar the Government from offering future dangerousness as a separate, stand-alone nonstatutory aggravating factor.  Gooch Mem. at 95.

The Court is not persuaded that Congress, by so drafting the FDPA, implicitly intended to exclude information about a capital defendant's criminal history that, while not falling within an enumerated factor, nonetheless (by Mr. Gooch's own logic) bears on his future dangerousness.  The enumerated factors that explicitly account for past criminal conduct share a common thread: each refers to a prior conviction for a crime *sufficiently serious* to be a statutory aggravator to the current capital crime (e.g., a felony firearm offense, an offense punishable by life or death, an offense resulting in serious injury or death, a felony drug offense, a serious federal drug offense, or a sexual assault or child molestation offense).  Assuming that the intent factor has been established, any one of these factors, standing alone, could be sufficiently aggravating to warrant a death sentence.  Once the gateway hurdles are met, however, any other information relevant to the character of the defendant or the circumstances of the offense is admissible.  On one hand, information about prior serious crimes of the sort referenced in the enumerated factors is arguably more strongly probative of future dangerousness than information about other, lesser prior crimes; on the other hand, more frequent participation in lesser crimes — in the words of the Notice, a "continuing pattern of violence" or a "longstanding involvement in criminal activities" — might be viewed as equally dangerous.  That judgment is for the jury, and information about Mr. Gooch's past

53

criminal conduct, even if it falls outside the scope of the enumerated factors, is certainly relevant to its decision.

This conclusion is consistent with settled precedent recognizing that a capital defendant's criminal history, whether related to the underlying offense or not, is a relevant sentencing consideration, and that such evidence is properly considered under the rubric of future dangerousness. As the Supreme Court has explained,

> Consideration of a defendant's past conduct as indicative of his probable future behavior is an inevitable and not undesirable element of criminal sentencing: any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose. The Court has therefore held that evidence that a defendant would in the future pose a danger to the community if he were not executed may be treated as establishing an aggravating factor for purposes of capital sentencing.

*Skipper v. South Carolina*, 476 U.S. 1, 5 (1986) (citations and internal quotation marks omitted); *see Zant*, 462 U.S. at 888 ("Nothing in the United States Constitution prohibits a trial judge from instructing a jury that it would be appropriate to take account of a defendant's prior criminal record in making its sentencing determination, even though the defendant's prior history of noncapital convictions could not by itself provide sufficient justification for imposing the death sentence."). Indeed, contrary to Mr. Gooch's assertions, Gooch Mem. at 97, even "*un*adjudicated criminal conduct is admissible during the penalty phase of a capital trial," *Edelin*, 134 F. Supp. 2d at 76-77 (emphasis added); *see also Cooper*, 91 F. Supp. 2d at 106 (collecting cases). In passing the FDPA, Congress did not intend to alter these understandings. Rather, allowing future dangerousness to stand alone as a nonstatutory aggravating factor, measured, in part, by criminal history, allows the jury to make a prediction based on "all possible relevant information about the individual defendant

54

whose fate it must determine." *Barefoot v. Estelle*, 463 U.S. 880, 897 (1983).[24]

Finally, Mr. Gooch argues that future dangerousness has been alleged so routinely by federal prosecutors in recent years that it is "worthless as a distinguishing criteri[on]" and "no longer constitutes a rational basis on which to impose the death penalty." Gooch Mem. at 97. He offers no statistics to support this argument. It is no matter; the argument is a nonstarter. As a nonstatutory aggravating factor, information concerning future dangerousness need not further narrow the pool of capital defendants, it need only be relevant to the weighing process.

### c. Low Rehabilitative Potential

Mr. Gooch challenges the use of low rehabilitative potential, "as evidenced by his longstanding involvement in criminal activities, including drug trafficking and violence," as a subfactor counseling a finding of future dangerousness. His principal argument here is that "the literature suggests" that neither professionals nor laymen are able to predict accurately a defendant's future dangerousness, rendering the sentencing decision "little more than a guessing game." Gooch Mem. at 98. He asks the Court to require the Government to prove, at an evidentiary hearing, "that a jury . . . is capable of accurately distinguishing those defendants . . . who present a future danger based upon low rehabilitative potential from those who do not," or, he argues, the subfactor should be stricken and the Government precluded from attempting to prove future dangerousness at all. *Id.*

---

[24] Because Mr. Gooch, if convicted on Counts 126 and 128, must be sentenced either to death or life without parole, the Government agrees that penalty-phase information about future dangerousness must be limited to dangerousness "within the context of serving a life sentence within the Bureau of Prisons." Gov't Opp'n at 100 n.29; *see* Gooch Mem. at 96-97. The Court concurs. *See Simmons v. South Carolina*, 512 U.S. 154, 163 (1994); *Cooper*, 91 F. Supp. 2d at 111-12. The Court rejects, however, Mr. Gooch's suggestion that the possibility of incarceration in the "Supermax" facility in Florence, Colorado, or the underground facility in Marion, Indiana, negates any possibility of future dangerousness. Gooch Mem. at 97.

The "literature" supporting this argument is cited nowhere.   The argument also founders on precedent endorsing the "likelihood of a defendant's committing further crimes" as a "constitutionally acceptable criterion for imposing the death penalty" when weighed by lay jurors or professionals.   *Barefoot*, 463 U.S. at 896-97 (holding that psychiatric testimony is generally admissible on the issue of future dangerousness).   "It is, of course, not easy to predict future behavior.  The fact that such a determination is difficult, however, does not mean that it cannot be made. . . . Any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose."   *Id.* at 898 (quoting *Jurek*, 428 U.S. at 274-75 (plurality opinion)).

In his reply, Mr. Gooch creatively argues that because a defendant's "potential for rehabilitation" is a proper mitigating factor, *see Hitchcock v. Dugger*, 481 U.S. 393 (1987), and the absence of mitigating evidence cannot constitute an aggravating factor, *see, e.g.*, *People v. Bonin*, 46 Cal. 3d 659, 700 (Cal. 1988), the absence of a "potential for rehabilitation" — in other words, a "low rehabilitative potential" — cannot serve as an aggravating factor.  Gooch Reply at 19.   Adding that Congress has declared that "imprisonment is not an appropriate means of promoting correction and rehabilitation," 18 U.S.C. § 3582(a), he contends that a defendant's low rehabilitative potential is an improper justification for a capital sentence.  Gooch Reply at 20.

The Court has given careful attention to this argument but concludes that it misperceives the Government's point.  Mr. Gooch's alleged low rehabilitative potential is relevant here not as a stand-alone nonstatutory aggravating factor, but as it bears on his future dangerousness in prison.  In this context, low rehabilitative potential, as measured, in the words of the Notice, by Mr. Gooch's "longstanding involvement in criminal activities, including drug trafficking and

56

violence," is best understood as a predictor of Mr. Gooch's future behavior based on his prior

criminal history. *See United States v. Davis*, 912 F. Supp. 938, 946 (E.D. La. 1996) (construing

"rehabilitative potential" to mean the  "potential for becoming a nonthreat to the health and safety

of others" and, thus, "the converse of future dangerousness"); *Satterwhite v. Texas*, 486 U.S. 249,

264 (1988) (Marshall, J., concurring) (recognizing that "psychiatric testimony is generally of critical

importance to the sentencing determination, covering issues of rehabilitative potential, future

dangerousness, and individual culpability").

        If Mr. Gooch indeed can be shown to have a low rehabilitative potential, the risk that

he would remain a danger to other prisoners and prison officials would be increased. *United States*

*v. Allen*, 247 F.3d 741, 788 (8th Cir. 2001) ("A defendant in prison for life is still a risk to prison

officials and to other inmates, and . . . there is still a chance that the defendant might escape from

prison or receive a pardon or commutation of sentence."), *vacated on other grounds*, 536 U.S. 953

(2002).  Prisoners deserve protection from their fellow prisoners.  And the possibility that Mr. Gooch

would be a danger to other inmates is a factor that is well understood, well supported, and as specific

as the Constitution requires.  *See Simmons*, 512 U.S. at 163 ("The defendant's character, prior

criminal history, mental capacity, background, and age are just a few of the many factors, in addition

to future dangerousness, that a jury may consider in fixing appropriate punishment."); *Jurek*, 428

U.S. at 272-73 (plurality opinion) (approving of the jury's consideration of the "range and severity

of . . . prior criminal conduct" in determining "whether there is a probability that the defendant

would commit criminal acts of violence that would constitute a continuing threat to society").

### d.  Membership in a Criminal Street Gang

Finally, Mr. Gooch argues that his alleged membership in a criminal street gang —

specifically, his "allegiance to and active membership in the M Street Crew" — should be stricken

as a subfactor of future dangerousness because it "encompasses almost every conspiracy trial

prosecuted in the District" and thus "renders this [sub]factor worthless as a distinguishing criteri[on]

for application of the death penalty."  Gooch Mem. at 99.  Mr. Gooch relies heavily on *United States*

*v. Grande*, 353 F. Supp. 2d 623, 638 (E.D. Va. 2005), in which the court struck the following stand-

alone nonstatutory aggravating factor:

> Defendant . . . was a member of a criminal street gang as defined by
> 18 U.S.C. § 521(a), namely Mara Salvatrucha, also known as
> "MS-13."  As a member of MS-13, defendant . . . agreed to engage
> in acts of violence, including murder and aggravating assaults.
> Defendant . . . was a senior member of . . . [a] clique of MS-13, and
> as such was an enforcer of the rules of MS-13.

Motivated by a concern that the factor focused not on the defendant's characteristics, but on the

behavior of the gang as a whole, the court struck the factor for failing to "assist the jury in making

an *individualized* determination of whether [the defendant] should receive the death penalty."  *Id.*

(citing *Zant*, 462 U.S. at 879).  Mr Gooch urges the Court to adopt the same reasoning.

The Government attempts to distinguish *Grande* on the ground that, in this case, it

offers information about Mr. Gooch's membership in the M Street Crew not as a stand-alone

aggravating factor but as a subfactor bearing on future dangerousness.  Gov't Opp'n at 105-06.

However, the *Grande* court also rejected the prosecution's attempt to offer, as bearing on future

dangerousness, information that the defendant, while incarcerated, "continued to conduct and

influence MS-13 gang business occurring inside and outside of the correction[al] institution."

58

*Grande*, 353 F. Supp. 2d at 640.  The court ruled that the phrases "conduct and influence" and "gang business" were vague and undefined, that the information was more prejudicial than probative, and that such information would distract from goal of selecting an individualized sentence.  *Id.*  Thus, the Government's distinctions hold little water.  Nonetheless, the Court declines to follow *Grande*.

As the parties agree and the Court has ruled, penalty-phase information about future dangerousness must be limited to dangerousness "within the context of serving a life sentence within the Bureau of Prisons."  *See supra* n.26.  If Mr. Gooch is convicted and imprisoned for life, there remains the possibility that his ties to other M Street Crew members would allow him to direct or participate in illicit activities within or beyond the prison walls.  This is more than mere speculation; for example, the Court has heard evidence that one of Mr. Gooch's codefendants, Joseph Blackson, continued to participate in drug sales while incarcerated at the D.C. Jail.  Moreover, in providing for enhanced penalties for drug and violent offenses committed in connection with gang membership, Congress has recognized that gang activity magnifies the already significant threat to communities posed by drugs and violence.  *See* 18 U.S.C. § 521.  Mr. Gooch's alleged decision to join and remain loyal to the M Street Crew, a group that pooled its energies and resources toward violent ends, ineluctably bears on whether he would follow the same behavior patterns in prison.  *Cf. Dawson v. Delaware*, 503 U.S. 159, 166 (1992) ("In many cases, for example, associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society.").

Accordingly, the Court finds that Mr. Gooch's membership in and allegiance to the M Street Crew is an appropriate sentencing consideration that will assist the jury in selecting an

individualized sentence.[25]

## IV. CONCLUSION

For the reasons stated above, it is hereby

**ORDERED** that victim impact information shall be limited to the family and friends of the victims of the alleged capital murders, Mr. Cooper and Ms. Miller, as set forth in Part III.B.4.b.i of this Memorandum Opinion; and it is

**FURTHER ORDERED** that the Government shall elaborate on the nature of its victim impact information consistent with Part III.B.4.b.ii of this Memorandum Opinion; and it is

**FURTHER ORDERED** that Mr. Gooch's Motion to Declare the FDPA Unconstitutional, to Dismiss the Special Findings from the Indictment, to Strike the Notice of Intent to Seek the Death Penalty, to Strike the Aggravating Factors, and to Request an Evidentiary Hearing is **DENIED** in all other respects. In light of its discussion and disposition, the Court finds that no evidentiary hearing is necessary to rule on the sufficiency of the statutory and nonstatutory aggravating factors alleged by the Government.

**SO ORDERED**.

Date: December 20, 2006             /s/

ROSEMARY M. COLLYER

United States District Judge

---

[25] Mr. Gooch's argument that this subfactor is another "de facto aggravator," Gooch Mem. at 93, is rejected for reasons already discussed.